# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FIRESTONE FINANCIAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Hon. Milton I. Shadur |
| | ) | |
| v. | ) | Case No. 13 cv 07241 |
| | ) | |
| JHM EQUIPMENT LEASING COMPANY, | ) | |
| J H MEYER ENTERPRISES, INC., DOLPHIN | ) | |
| LAUNDRY SERVICES, INC. and JOHN | ) | |
| MEYER, | ) | |
| | ) | |
| Defendants. | ) | |

## JHM DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES & COUNTERCLAIM

JHM Equipment Leasing Company, J H Meyer Enterprises, Inc., Dolphin Laundry Services, Inc. and John Meyer (collectively, "Defendants") through their attorneys, Thompson Coburn LLP, as their Answer and Affirmative Defenses to Plaintiff's Verified Complaint for Replevin and Other Relief and Counterclaim, state as follows:

### PARTIES

1.     FIRESTONE is a Massachusetts corporation with its principal place of business located at 27 Christina St., Newton, MA 02461.

**ANSWER:     Upon information and belief, Defendants agree to the allegations in paragraph 1.**

2.     JHM is an Illinois corporation with its principal place of business located at 1080 Entry Dr., Bensenville, IL 60106.

**ANSWER:     Defendants agree to the allegations in paragraph 2.**

3.     MEYER ENTERPRISES is an Illinois corporation with its principal place of business located at 1080 Entry Dr., Bensenville, IL 60106.

**ANSWER:     Defendants agree to the allegations in paragraph 3.**

4.     DOLPHIN is an Illinois corporation with its principal place of business located at 1080 Entry Dr., Bensenville, IL 60106.

**ANSWER:** Defendants agree to the allegations in paragraph 4.

5.      JOHN MEYER is a citizen of the State of Illinois with an address in Hinsdale, Illinois.

**ANSWER:** Defendants agree to the allegations in paragraph 5.

JURISDICTION AND VENUE

6.      Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §1332.  The parties are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

**ANSWER:** Defendants agree to the allegations in paragraph 6.

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 by virtue of the fact that a substantial part of the events or omissions giving rise to FIRESTONE's claims occurred in this district and because JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER are subject to personal jurisdiction in this district.

**ANSWER:** Defendants agree to the allegations in paragraph 7.

FACTS COMMON TO ALL COUNTS
First Loan

8.      On or about June 29, 2012, JHM executed a Promissory Note (the "First Note") in favor of FIRESTONE for the principal amount of $45,788.00 pursuant to the contemporaneously executed Security Agreement.  See First Note attached hereto as Exhibit 1.

**ANSWER:**      **Defendants agree to the allegations in paragraph 8 regarding execution of the Promissory Note but state the Promissory Note was executed on June 28, 2012. Defendants cannot admit or deny whether execution of the Promissory Note was "pursuant to" a security agreement because the allegation is unintelligible.  Defendants admit a Security Agreement was executed by JHM in favor of Firestone on June 28, 2012.**

9.      JHM agreed to make payment as follows: thirty-five (35) consecutive monthly payments of $1,461.45, followed by one (1) final payment in an amount sufficient to fully amortize said outstanding principal balance, all as set forth in detail in the First Note.  See Exhibit 1.

**ANSWER:**      **Defendants agree only that the Promissory Note contains the payment schedule alleged.**

10.     Also on or about June 28, 2012, JHM and FIRESTONE entered into Security Agreement No. 537635 (the "First Security Agreement"), wherein JHM granted FIRESTONE a security interest in all of the assets and all of the equipment used in connection with JHM's business, including the equipment specifically identified on Schedule A to the First Security Agreement (the "First Collateral"). See First Security Agreement attached hereto as Exhibit 2.

**ANSWER:     Defendants agree to the allegations in paragraph 10.**

11.     To induce FIRESTONE to enter into the First Note and First Security Agreement (collectively the "First Loan"), MEYER ENTERPRISES guaranteed the obligations of JHM under the First Loan (the "MEYER ENTERPRISES First Loan Guaranty"). See MEYER ENTERPRISES First Loan Guaranty attached hereto as Exhibit 3.

**ANSWER:     Defendants agree that on June 28, 2012 Meyer Enterprises executed a Guaranty of JHM's obligations. Defendants deny all remaining allegations.**

12.     To further induce FIRESTONE to enter into the First Loan, DOLPHIN guaranteed the obligations of JHM under the First Loan (the "DOLPHIN First Loan Guaranty"). See DOLPHIN First Loan Guaranty attached hereto as Exhibit 4.

**ANSWER:     Defendants agree that on June 28, 2012 Dolphin executed a Guaranty of JHM's obligations. Defendants deny all remaining allegations.**

13.     To further induce FIRESTONE to enter into the First Loan, JOHN MEYER personally guaranteed the obligations of JHM under the First Loan (the "JOHN MEYER First Loan Guaranty"). See JOHN MEYER First Loan Guaranty attached hereto as Exhibit 5.

**ANSWER:     Defendants agree that on June 28, 2012 Meyer executed a Guaranty of JHM's obligations. Defendants deny all remaining allegations.**

14.     FIRESTONE properly perfected its security interest in the First Collateral. A true and correct copy of the UCC-1 Financing Statement reflecting FIRESTONE's first priority lien in the First Collateral is attached hereto as Exhibit 6.

**ANSWER:     Defendants agree to the allegations in paragraph 14.**

### Second Loan

15.     On or about November 16, 2012, JHM executed a Promissory Note (the "Second Note") in favor of FIRESTONE for the principal amount of $44,165.25 pursuant to the contemporaneously executed Security Agreement. See Second Note attached hereto as Exhibit 7.

**ANSWER:     Defendants agree to the allegations in paragraph 15 regarding execution of the Second Note. Defendants cannot admit or deny whether execution of the Second Note**

was "pursuant to" a security agreement because the allegation is unintelligible. Defendants admit a Security Agreement was executed by JHM in favor of Firestone on or about the time the Second Note was executed.

16.     JHM agreed to make payment as follows:  thirty-five (35) consecutive monthly payments of $1,440.75, followed by one (1) final payment in an amount sufficient to fully amortize said outstanding principal balance, all as set forth in detail in the Second Note.  See Exhibit 7.

**ANSWER:**     **Defendants agree only that the Second Note contains the payment schedule alleged.**

17.     Also on or about November 15, 2012, JHM and FIRESTONE entered into Security Agreement No. 538613 (the "Second Security Agreement"), wherein JHM granted FIRESTONE a security interest in all of the assets and all of the equipment used in connection with JHM's business, including the equipment specifically identified on Schedule A to the Second Security Agreement (the "Second Collateral").  See Second Security Agreement attached hereto as Exhibit 8.

**ANSWER:**     **Defendants agree to the allegations in paragraph 17.**

18.     To induce FIRESTONE to enter into the Second Note and Second Security Agreement (collectively the "Second Loan"), MEYER ENTERPRISES guaranteed the obligations of JHM under the Second Loan (the "MEYER ENTERPRISES Second Loan Guaranty").  See MEYER ENTERPRISES Second Loan Guaranty attached hereto as Exhibit 9.

**ANSWER:**     **Defendants agree that in or about November, 2012 Meyer Enterprises executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

19.     To further induce FIRESTONE to enter into the Second Loan, DOLPHIN guaranteed the obligations of JHM under the Second Loan (the "DOLPHIN Second Loan Guaranty").  See DOLPHIN Second Loan Guaranty attached hereto as Exhibit 10.

**ANSWER:**     **Defendants agree that in or about November, 2012 Dolphin executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

20.     To further induce FIRESTONE to enter into the Second Loan, JOHN MEYER personally guaranteed the obligations of JHM under the Second Loan (the "JOHN MEYER Second Loan Guaranty").  See JOHN MEYER Second Loan Guaranty attached hereto as Exhibit 11.

**ANSWER:**     **Defendants agree that in or about November, 2012 Meyer executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

21.     FIRESTONE properly perfected its security interest in the Second Collateral.  A true and correct copy of the UCC-1 Financing Statement reflecting FIRESTONE's first priority lien in the Second Collateral is attached hereto as Exhibit 12.

**ANSWER:**     **Defendants agree to the allegations in paragraph 21.**

## Third Loan

22.     On or about February 19, 2013, JHM executed a Promissory Note (the "Third Note") in favor of FIRESTONE for the principal amount of $97,882.85 pursuant to the contemporaneously executed Security Agreement.  See Third Note attached hereto as Exhibit 13.

**ANSWER:**     **Defendants agree to the allegations in paragraph 22 regarding execution of the Third Note.  Defendants cannot admit or deny whether execution of the Third Note was "pursuant to" a security agreement because the allegation is unintelligible. Defendants admit a Security Agreement was executed by JHM in favor of Firestone on or about the time the Third Note was executed.**

23.     JHM agreed to make payment as follows:  fifty-nine (59) consecutive monthly payments of $2,043.77, followed by one (1) final payment in an amount sufficient to fully amortize said outstanding principal balance, all as set forth in detail in the Third Note.  See Exhibit 13.

**ANSWER:**     **Defendants agree only that the Third Note contains the payment schedule alleged.**

24.     Also on or about February 19, 2013, JHM and FIRESTONE entered into Security Agreement No. 539321 (the "Third Security Agreement"), wherein JHM granted FIRESTONE a security interest in all of the assets and all of the equipment used in connection with JHM's business, including the equipment specifically identified on Schedule A to the Third Security Agreement (the "Third Collateral").  See Third Security Agreement attached hereto as Exhibit 14.

**ANSWER:**     **Defendants agree to the allegations in paragraph 24.**

25.     To induce FIRESTONE to enter into the Third Note and Third Security Agreement (collectively the "Third Loan"), MEYER ENTERPRISES guaranteed the obligations of JHM under the Third Loan (the "MEYER ENTERPRISES Third Loan Guaranty").  See MEYER ENTERPRISES Third Loan Guaranty attached hereto as Exhibit 15.

**ANSWER:**     **Defendants agree that on February 19, 2013 Meyer Enterprises executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

26.     To further induce FIRESTONE to enter into the Third Loan, DOLPHIN guaranteed the obligations of JHM under the Third Loan (the "DOLPHIN Third Loan Guaranty"). See DOLPHIN Third Loan Guaranty attached hereto as Exhibit 16.

**ANSWER:**     **Defendants agree that on February 19, 2013 Dolphin executed a Guaranty of JHM's obligations. Defendants deny all remaining allegations.**

27.     To further induce FIRESTONE to enter into the Third Loan, JOHN MEYER personally guaranteed the obligations of JHM under the Third Loan (the "JOHN MEYER Third Loan Guaranty"). See JOHN MEYER Third Loan Guaranty attached hereto as Exhibit 17.

**ANSWER:**     **Defendants agree that on February 19, 2013 Meyer executed a Guaranty of JHM's obligations. Defendants deny all remaining allegations.**

28.     FIRESTONE properly perfected its security interest in the Third Collateral. A true and correct copy of the UCC-1 Financing Statement reflecting FIRESTONE's first priority lien in the Third Collateral is attached hereto as Exhibit 18.

**ANSWER:**     **Defendants agree to the allegations in paragraph 28.**

### Fourth Loan

29.     On or about June 17, 2013, JHM executed a Promissory Note (the "Fourth Note") in favor of FIRESTONE for the principal amount of $66,278.89 pursuant to the contemporaneously executed Security Agreement. See Fourth Note attached hereto as Exhibit 19.

**ANSWER:**     **Defendants agree to the allegations in 29 regarding execution of the Fourth Note. Defendants cannot admit or deny whether execution of the Fourth Note was "pursuant to" a security agreement because the allegation is unintelligible. Defendants admit a Security Agreement was executed by JHM in favor of Firestone on or about the time the Fourth Note was executed.**

30.     JHM agreed to make payment as follows: fifty-nine (59) consecutive monthly payments of $1,408.23, followed by one (1) final payment in an amount sufficient to fully amortize said outstanding principal balance, all as set forth in detail in the Fourth Note. See Exhibit 19.

**ANSWER:**     **Defendants agree only that the Fourth Note contains the payment schedule alleged.**

31.    Also on or about June 17, 2013, JHM and FIRESTONE entered into Security Agreement No. 540263 (the "Fourth Security Agreement"), wherein JHM granted FIRESTONE a security interest in all JHM's personal property, including the equipment specifically identified on Schedule A to the Fourth Security Agreement (the "Fourth Collateral").    See Fourth Security Agreement attached hereto as Exhibit 20.

**ANSWER:**    **Defendants agree to the allegations in paragraph 31.**

32.    To induce FIRESTONE to enter into the Fourth Note and Fourth Security Agreement (collectively the "Fourth Loan"), MEYER ENTERPRISES guaranteed the obligations of JHM under the Fourth Loan (the "MEYER ENTERPRISES Fourth Loan Guaranty").    See MEYER ENTERPRISES Fourth Loan Guaranty attached hereto as Exhibit 21.

**ANSWER:**    **Defendants agree that on June 17, 2013 Meyer Enterprises executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

33.    To further induce FIRESTONE to enter into the Fourth Loan, DOLPHIN guaranteed the obligations of JHM under the Fourth Loan (the "DOLPHIN Fourth Loan Guaranty").  See DOLPHIN Fourth Loan Guaranty attached hereto as Exhibit 22.

**ANSWER:**    **Defendants agree that on June 17, 2013 Dolphin executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

34.    To further induce FIRESTONE to enter into the Fourth Loan, JOHN MEYER personally guaranteed the obligations of JHM under the Fourth Loan (the "JOHN MEYER Fourth Loan Guaranty").  See JOHN MEYER Fourth Loan Guaranty attached hereto as Exhibit 23.

**ANSWER:**    **Defendants agree that on June 17, 2013 Meyer executed a Guaranty of JHM's obligations.  Defendants deny all remaining allegations.**

35.    FIRESTONE properly perfected its security interest in the Fourth Collateral.  A true and correct copy of the UCC-1 Financing Statement reflecting FIRESTONE's first priority lien in the Fourth Collateral is attached hereto as Exhibit 24.

**ANSWER:**    **Defendants agree to the allegations in paragraph 35.**

36.    JHM remains in possession and control of the First Collateral, Second Collateral, Third Collateral and Fourth Collateral (collectively the "Collateral").

**ANSWER:** Defendants deny the allegations in paragraph 36. Answering further, Defendants remain in possession and control of some collateral but not all collateral.

**Payment Default**

37. FIRESTONE has performed all of its obligations under the First Loan, Second Loan, Third Loan and Fourth Loan (collectively referred to as the "Loans").

**ANSWER:** Defendants deny the allegations in paragraph 37.

38. JHM defaulted under the First Loan by failing to make all necessary payment when due.

**ANSWER:** Defendants deny the allegations in paragraph 38.

39. JHM defaulted under the Second Loan by failing to make all necessary payments when due.

**ANSWER:** Defendants deny the allegations in paragraph 39.

40. JHM defaulted under the Third Loan by failing to make all necessary payments when due.

**ANSWER:** Defendants deny the allegations in paragraph 40.

41. JHM defaulted under the Fourth Loan by failing to make all necessary payments when due.

**ANSWER:** Defendants deny the allegations in paragraph 41.

42. Pursuant to the Loans, FIRESTONE is entitled to contractual money damages as provided therein, both for the amount due thereunder, as accelerated, and for those damages inflicted upon the Collateral, as well as any and all additional damages specified as a remedy after default.

**ANSWER:** Defendants agree only that the Loans entitle Firestone to the damages alleged upon default. Defendants deny all remaining allegations.

43. As a result of the default under the First Loan, FIRESTONE is entitled to payment of $31,253.47, after crediting JHM for all payments received pursuant to the First Loan.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43.

44.     FIRESTONE is also entitled to payment of late charges of $73.07 pursuant to the First Loan.  See First Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44.**

45.     FIRESTONE is further entitled to payment of fees of $70.00 pursuant to the First Loan for insufficient funds (NSF) on ACH payments.  See First Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45.**

46.     As a result of the default under the Second Loan, FIRESTONE is entitled to payment of $37,854.45, after crediting JHM for all payments received pursuant to the Second Loan.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46.**

47.     FIRESTONE is also entitled to payment of late charges of $216.12 pursuant to the Second Loan.  See Second Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 47.**

48.     FIRESTONE is further entitled to payment of fees of $105.00 pursuant to the Second Loan for insufficient funds (NSF) on ACH payments.  See Second Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48.**

49.     As a result of the default under the Third Loan, FIRESTONE is entitled to payment of $95,123.84, after crediting JHM for all payments received pursuant to the Third Loan.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 49.**

50.     FIRESTONE is also entitled to payment of late charges of $306.57 pursuant to the Third Loan.  See Third Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 50.**

51.     FIRESTONE is further entitled to payment of fees of $105.00 pursuant to the Third Loan for insufficient funds (NSF) on ACH payments.  See Third Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 51.**

52.     As a result of the default under the Fourth Loan, FIRESTONE is entitled to payment of $68,212.02, after crediting JHM for all payments received pursuant to the Fourth Loan.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52.**

53.     FIRESTONE is also entitled to payment of late charges of $211.23 pursuant to the Fourth Loan.  See Fourth Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 53.**

54.     FIRESTONE is further entitled to payment of fees of $175.00 pursuant to the Fourth Loan for insufficient funds (NSF) on ACH payments.  See Fourth Loan attached hereto.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 54.**

55.     For the monies due under the Loans, FIRESTONE is entitled to pre-judgment interest at the contractual rate of eighteen percent (18%) per annum, or the maximum rate permitted by law.  See Exhibits 1, 7, 13, and 19.

**ANSWER:     Defendants admit only that the Promissory Notes provide for an annual interest rate of 18% or the maximum allowed by law on amounts overdue under the Promissory Notes.**

56. FIRESTONE is further entitled to attorneys' fees and costs pursuant to the Loans. See Loans.

**ANSWER:** **Defendants admit only that the Promissory Notes provide for payment of reasonable attorneys' fees incurred by Firestone in connection with the enforcement of obligations evidenced by the Promissory Notes.**

**COUNT I**
**BREACH OF CONTRACT AGAINST JHM**

57. FIRESTONE repeats and realleges paragraph 1 through 56 as though fully set forth herein in paragraph 57 of Count I of its Complaint.

**ANSWER:** **Defendants repeat and reallege their answers to paragraphs 1 through 56 above as their answer to paragraph 57 as if fully set forth herein.**

58. JHM defaulted under the Loans by failing to make all necessary payments when due.

**ANSWER:** **Defendants deny the allegations in paragraph 58.**

59. JHM has failed and refused to make payment despite demand.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation because Firestone does not allege what payment JHM refused to make. Answering further, Defendants admit Firestone has demanded certain payments.**

60. As a result of JHM's default under the Loans, FIRESTONE is entitled to payment of $231,324.88, plus late charges of $806.99, plus fees for insufficient funds (NSF) on ACH payments of $455.00, plus prejudgment interest at the rate of eighteen percent (18%) per annum, and attorneys' fees and costs.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation**

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

## COUNT II
## BREACH OF GUARANTY AGAINST MEYER ENTERPRISES

61.     FIRESTONE repeats and realleges paragraph 1 through 60 as though fully set forth herein in paragraph 61 of Count II of its Complaint.

**ANSWER:     Defendants repeat and reallege their answers to paragraphs 1 through 60 above as their answer to paragraph 61 as if fully set forth herein.**

62.     Under the MEYER ENTERPRISES First Loan Guaranty, MEYER ENTERPRISES Second Loan Guaranty, MEYER ENTERPRISES Third Loan Guaranty and MEYER ENTERPRISES Fourth Loan Guaranty (collectively the "MEYER ENTERPRISES Guaranties"), MEYER ENTERPRISES is indebted to FIRESTONE for the amounts set forth herein with regard to the Loans.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 62 because Firestone does not allege what amount Meyer Enterprises is indebted for.**

63.     MEYER ENTERPRISES has failed and refused to make payments due and owing under the MEYER ENTERPRISES Guaranties.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 63 because Firestone does not allege what payment Meyer Enterprises refused to make.  Defendants agree that Meyer Enterprises has not made payments under the Guaranties.**

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

## COUNT III
## BREACH OF GUARANTY AGAINST DOLPHIN

64.     FIRESTONE repeats and realleges paragraph 1 through 63 as though fully set forth herein in paragraph 64 of Count III of its Complaint.

**ANSWER:     Defendants repeat and reallege their answers to paragraphs 1 through 63 above as their answer to paragraph 64 as if fully set forth herein.**

65. Under the DOLPHIN First Loan Guaranty, DOLPHIN Second Loan Guaranty, DOLPHIN Third Loan Guaranty and DOLPHIN Fourth Loan Guaranty (collectively the "DOLPHIN Guaranties"), DOLPHIN is indebted to FIRESTONE for the amounts set forth herein with regard to the Loans.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 65 because Firestone does not allege what amount Dolphin is indebted for.**

66. DOLPHIN has failed and refused to make payments due and owing under the DOLPHIN Guaranties.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 66 because Firestone does not allege what payment Dolphin refused to make. Defendants agree that Dolphin has not made payments under the Guaranties.**

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

## COUNT IV
## BREACH OF GUARANTY AGAINST JOHN MEYER

67. FIRESTONE repeats and realleges paragraph 1 through 66 as though fully set forth herein in paragraph 67 of Count IV of its Complaint.

**ANSWER: Defendants repeat and reallege their answers to paragraphs 1 through 66 above as their answer to paragraph 67 as if fully set forth herein.**

68. Under the JOHN MEYER First Loan Guaranty, JOHN MEYER Second Loan Guaranty, JOHN MEYER Third Loan Guaranty and JOHN MEYER Fourth Loan Guaranty (collectively the "JOHN MEYER Guaranties"), JOHN MEYER is indebted to FIRESTONE for the amounts set forth herein with regard to the Loans.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 68 because Firestone does not allege what amount Meyer Enterprises is indebted for.**

69.     JOHN MEYER has failed and refused to make payments due and owing under the JOHN MEYER Guaranties.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 66 because Firestone does not allege what payment Meyer refused to make.  Defendants agree that Meyer has not made payments under the Guaranties.**

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

## COUNT V
## REPLEVIN

70.     FIRESTONE repeats and realleges paragraphs 1 through 69 as though fully set forth herein in paragraph 70 of Count V of its Complaint.

**ANSWER:     Defendants repeat and reallege their answers to paragraphs 1 through 69 above as their answer to paragraph 70 as if fully set forth herein.**

71.     This claim is brought pursuant to Illinois Code of Civil Procedure § 19-101 et seq., made applicable to this proceeding pursuant to 28 U.S.C. § 1652, for the collateral located in Illinois.

**ANSWER:     Defendants agree that Plaintiff purports to bring this claim under Illinois Code of Civil Procedure § 19-101 and that that section is applicable here.**

72.     Pursuant to the Loans, FIRESTONE has a first priority security interest in the Collateral.

**ANSWER:     Defendants agree to the allegations in paragraph 72.**

73.     Due to JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER's failure to make payment as required under the Loans and guaranties thereof, FIRESTONE is entitled to possession of the Collateral.

**ANSWER:     Defendants deny the allegations in paragraph 73.**

74.     FIRESTONE has been unable to secure the Collateral by peaceful means.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 74.**

75.     JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER are wrongfully and unlawfully detaining the Collateral.

**ANSWER:** **Defendants deny the allegations in paragraph 75.**

76.     FIRESTONE has made demand upon JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER for the return of the Collateral, but JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER have failed and refused to return same.

**ANSWER:** **Defendants agree only that Firestone has demanded the Collateral and that the Collateral has not yet been given to Firestone.**

77.     FIRESTONE will suffer irreparable damages if the Collateral is not returned to FIRESTONE.

**ANSWER:** **Defendants deny the allegations in paragraph 77.**

78.     FIRESTONE is unable to determine what Collateral remains in JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER's possession and control, and does not know the condition of the Collateral in order to provide a value estimate.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 78. Defendants deny that Plaintiff is not able to provide a value estimate.**

79.     The Collateral has not been taken for any tax, assessment, or fine levied by virtue of any laws of the state of Illinois, against the property of FIRESTONE, nor seized under any lawful process against the goods and chattels of FIRESTONE subject to such lawful process, nor held by virtue of any order for replevin, execution or attachment against FIRESTONE.

**ANSWER:** **Defendants agree to the allegations in paragraph 79.**

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

**COUNT VI**
**DETINUE**

81. FIRESTONE repeats and realleges paragraphs 1 through 80 as though fully set forth herein in paragraph 81 of Count VI of its Complaint.

**ANSWER:** **Defendants repeat and reallege their answers to paragraphs 1 through 80 above as their answer to paragraph 81 as if fully set forth herein.**

82. The Collateral is in JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER's possession and control.

**ANSWER:** **Defendants deny the allegations in paragraph 82. Answering further, Defendants remain in possession and control of some collateral but not all collateral.**

83. JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER are wrongfully retaining possession of the Collateral, because JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER have defaulted under the terms of the Loans and guaranties thereof by failing to make timely payments when due. Under the terms of the Loans, JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER are required to surrender the Collateral to FIRESTONE.

**ANSWER:** **Defendants agree only that upon a default, the Loans require them to surrender the Collateral.**

84. FIRESTONE's right to possession of the Collateral is superior to the rights of JHM, MEYER ENTERPRISES, DOLPHIN, and JOHN MEYER.

**ANSWER:** **Defendants deny the allegations in paragraph 84.**

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

**AFFIRMATIVE DEFENSES**

For their Affirmative Defenses, Defendants state as follows:

**First Affirmative Defense**

1. JHM's business consists, in part, of placing commercial laundry equipment in apartment buildings throughout the Chicago area (the "Route Business"). Plaintiff knew this

- 16 -

when it made the Second, Third and Fourth Loans. When Plaintiff made these loans, it was aware JHM had and would continue to place certain of the Collateral in its Route Business.

2. Dolphin's business consists of purchasing at wholesale and selling commercial laundry and certain domestic equipment including refrigerators, ranges and micro waves. Dolphin was an exclusive distributor of Maytag and Whirlpool commercial laundry equipment in Chicago, the ten surrounding counties and parts of Northwest Indiana. In addition to selling to other customers, Dolphin would purchase laundry equipment and sell it to JHM for use in JHM's Route Business.

3. Meyer Enterprises is in the commercial laundry business and has been since 2007. In October, 2012, Meyer Enterprises opened a new facility which allowed it to double its business. JHM leases certain laundry equipment to Meyer Enterprises.

4. In its Route Business, JHM obtains income through leasing laundry equipment to customers or through profit sharing agreements whereby apartment building owners accept a certain percentage of the fees residents pay to use the laundry machines and JHM retains the remainder of those fees.

5. Once a piece of equipment is placed in the Route Business, it provides a continuous stream of revenue. As a result, laundry machines which are in place as part of the Route Business are worth substantially more than machines that are sold separately.

6. Firestone is attempting to remove the laundry machine Collateral from JHM's Route Business.

7. The Collateral's value will be substantially impaired if it is removed from the Route Business.

8. By removing the Collateral from the Route Business, Plaintiff is failing to preserve the value of the Collateral and failing to mitigate its damages.

## Second Affirmative Defense

1.      JHM's business consists, in part, of placing commercial laundry equipment in apartment buildings throughout the Chicago area (the "Route Business"). Plaintiff knew this when it made the Second, Third and Fourth Loan ("Loans"). When Plaintiff made the Loans, it was aware JHM had and would continue to place certain of the Collateral in its Route Business.

2.      Dolphin's business consists of purchasing at wholesale and selling commercial laundry equipment and certain domestic equipment including refrigerators, ranges and micro waves. Dolphin was an exclusive distributor of Maytag and Whirlpool commercial laundry equipment in Chicago, the ten surrounding counties and parts of Northwest Indiana. In addition to selling to other customers, Dolphin would purchase laundry equipment and sell it to JHM for use in JHM's Route Business. Plaintiff knew this when it made the Loans.

3.      Meyer Enterprises is in the commercial laundry business and has been since 2007. In October, 2012, Meyer Enterprises opened a new facility which allowed it to double its business. JHM leases certain laundry equipment to Meyer Enterprises. Plaintiff knew this when it made the Loans.

4.      Plaintiff was aware, through its officer Dan McAllister, who was Firestone's Vice President of Business Development, and otherwise, that toward the end of 2012, JHM, Meyer Enterprises and Dolphin's businesses were increasing significantly because of Meyer Enterprises' new facility with increased capacity and because JHM's primary customer in the Route Business was aggressively buying and renovating buildings to be rented.

5.      McAllister frequently visited JHM, Meyer Enterprises and Dolphin's facilities and noted the expanding business. For example, McAllister toured Meyer Enterprises new commercial laundry facility in November, 2012. Firestone, through McAllister, represented to JHM, Meyer Enterprises and Dolphin, that it wanted to expand Firestone's investment in the laundry business.

6.     In furtherance of this, McAllister represented in November, 2012 that Firestone would "fund any equipment your need through the end of the year" and that Firestone would create a $500,000 line of credit for Firestone's use in 2013.  The line of credit would allow JHM, Dolphin and Meyer to draw down financing each time it purchased equipment rather than waiting until large quantities of equipment had been purchased and financing the equipment in packages.

7.     The line of credit was to be established in January, 2013.  McAllister later stated that this process would be delayed.  McAllister said that Firestone would complete the line of credit in 2013, and McAllister never indicated that Firestone did not view this commitment as binding.  McAllister further stated that Firestone would fund any packages submitted by JHM in 2013 until the line of credit was established.  The terms of this financing were agreed to by all parties and those terms are identical to those for the First Loan and Second Loan.

8.     JHM always purchased equipment and then financed it later.  Firestone preferred this method of financing because the equipment could be placed in a route and begin generating income contemporaneously with the financing.  When McAllister committed to fund any packages submitted by JHM on identical terms to the First and Second Loans, he knew that JHM would purchase equipment based on this commitment and then seek financing afterwards.

9.     McAllister knew that JHM did not have cash available to expand its Route Business in late 2012 because of the costs of the new facilities and because expanding business had increased outstanding receivables.  However, McAllister still encouraged JHM to continue expanding with Firestone's financing.  This is why McAllister represented to JHM that Firestone would continue financing equipment packages submitted by JHM on the same terms as the First Loan and Second Loan throughout 2013 or until the line of credit was established.

10.     In furtherance of its agreement, Firestone did provide the financing requested by JHM in February, 2013.  Sometime between February, 2013 and June, 2013, McAllister left Firestone's employment.  After McAllister left his employment, David Cohen, on behalf of Firestone, confirmed his knowledge that Firestone represented to JHM that it would provide requested financing on the customary terms and conditions.  However, Cohen agreed to finance only one additional package of equipment requested by JHM. This was the Fourth Loan.  Firestone refused to provide any further financing.

11.     When Firestone refused to provide further financing, JHM had already purchased laundry equipment already placed or to be placed in its Route Business based on Firestone's commitment to provide financing.  When Firestone refused to provide additional financing, JHM could not pay the amounts due for the equipment it had purchased from Maytag.  As a result, Maytag refused to sell equipment to any entity affiliated with JHM including Dolphin and Meyer Enterprises and placed those companies on a credit hold. Bob Meyer told David Cohen that this would occur should Firestone refuse to provide the financing it represented it would provide.

12.     JHM's primary customer for its domestic equipment had committed to continue ordering equipment for its buildings.  However, in order to maintain this business relationship, JHM required the ability to acquire equipment and equip each of the primary customer's buildings and apartment units when the customer needed the equipment.   Because of Firestone's actions, JHM, Dolphin and Meyer Enterprises could no longer acquire equipment and could not sell equipment to the customer.

13.     Firestone induced JHM into purchasing equipment to expand its business by promising to provide a $500,000 line of credit beginning in 2013.  When that line of credit was delayed, Firestone promised that it would finance any packages submitted in 2013 under the customary terms and conditions while finalizing the line of credit.  JHM would not have

purchased the equipment needed to expand its business if not for Firestone's commitment to provide financing. Firestone was informed that if it reneged on its commitment, JHM, Dolphin and Meyer Enterprises would suffer substantial damages. However, Firestone still refused to honor its agreement and JHM, Dolphin and Meyer Enterprises have suffered substantial damages.

14.     JHM, Dolphin and Meyer Enterprises relied to their detriment on the representations made by Firestone and suffered damages. As a result, Plaintiff is estopped from recovery.

## Third Affirmative Defense

1.     Defendants incorporate the allegations of the Second Affirmative Defense as if fully set forth herein.

2.     Firestone breached the parties' contracts prior to any payment default by Defendants by acting in a manner inconsistent with the reasonable expectations of the parties.

3.     Firestone's actions violated the implied covenant of good faith and fair deal and thus breached the contracts.

4.     Because of Firestone's prior breach, it cannot recover from Defendants.

## Fourth Affirmative Defense

1.     Firestone lacks standing. Each of the Promissory Notes at issue states it was assigned to RBS Citizens, N.A.

2.     As a result, RBS Citizens, N.A. and not Firestone is the proper party plaintiff in this action.

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

## COUNTERCLAIM

For their Counterclaim, Defendants state as follows:

### Parties

1.       JHM Equipment Leasing Company ("JHM") is in the business of placing commercial laundry equipment in buildings and businesses.  This equipment is either leased by businesses or by apartment buildings or placed in apartment buildings with a revenue sharing agreement whereby JHM and the building owner share the revenue obtained when tenants use the machines.

2.       JH Meyer Enterprises ("Meyer Enterprises") is in the commercial laundry business and has been since 2007.  In October, 2012, JH Meyer opened a new facility which allowed it to double its business.

3.       Dolphin Laundry Services, Inc. ("Dolphin") is an exclusive distributor of Maytag and Whirlpool commercial laundry equipment in Chicago, the ten surrounding counties and parts of Northwest Indiana and distributes domestic equipment to certain types of customers.

4.       Firestone Financial Corporation ("Firestone") is a lender organized and existing under the laws of the state of Massachusetts.

### Jurisdiction, Venue & Applicable Law

5.       This Court has jurisdiction under 28 U.S.C. §1332 because all counter-plaintiffs are citizens of different states than the counter-defendant and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. This Court also has supplemental jurisdiction over these claims under 28 U.S.C. § 1367.

6.       Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

7.       The Promissory Notes and Guaranties at issue in this matter all contain choice of law clauses providing that Massachusetts law governs.

**Facts Common to All Counts**

8.      JHM's business consists largely of placing commercial laundry equipment in apartment buildings and businesses throughout the Chicago area (the "Route Business") and selling domestic equipment to certain customers. Meyer Enterprises and Dolphin are related companies of JHM. Dolphin purchases laundry equipment and sells it to JHM and other customers. JHM leases certain equipment to Meyer Enterprises for use in its commercial laundry business. Plaintiff was aware of the nature of JHM, Meyer Enterprises and Dolphin's businesses, when it made loans to JHM in November, 2012, February, 2013 and June, 2013 (the "Second Loan," "Third Loan" and "Fourth Loan").

9.      Plaintiff was aware, through its officer Dan McAllister, who was Firestone's Vice President of Business Development, and otherwise, that toward the end of 2012, JHM, Dolphin and Meyer Enterprises' businesses were increasing significantly because of Meyer Enterprises' new facility with double capacity and because JHM's primary customer in the Route Business was aggressively buying and renovating buildings to be rented.

10.      McAllister frequently visited JHM, Meyer Enterprises and Dolphin's facilities and noted the expanding business. For example, McAllister toured Meyer Enterprises new commercial laundry facility in November, 2012. Around this time, McAllister told Bob Meyer that he wanted to expand Firestone's investment in the laundry business.

11.      In furtherance of McAllister's goal of expanding Firestone's investment in the laundry business, McAllister represented in November, 2012 that Firestone would "fund any equipment you need through the end of the year" and that Firestone would create a $500,000 line of credit for JHM's use in 2013. The line of credit would allow JHM, Dolphin and Meyer to draw down financing each time equipment was purchased rather than waiting until large quantities of equipment had been purchased and then financing the previously purchased equipment in packages.

12.     The line of credit was to be established in January, 2013.  McAllister later stated that this process would be delayed.  McAllister said that Firestone would provide the line of credit in 2013, and McAllister never said that Firestone did not view this commitment as binding.  McAllister further stated that Firestone would fund any equipment packages submitted by JHM in 2013 until the line of credit was established.  The terms of this financing were agreed to by all parties and were identical to those for the First Loan and Second Loan.

13.     JHM always purchased equipment and then financed it later.  Firestone knew this and actually preferred this method of financing because the equipment could be placed in JHM's Route Business and begin generating income contemporaneously with the financing.  When McAllister committed to fund any packages submitted by JHM in 2013 on identical terms to the First and Second Loans, he knew JHM would purchase equipment based on this representation and then seek financing afterwards.

14.     McAllister knew JHM, Meyer Enterprises and Dolphin did not have cash available to purchase the equipment needed to expand JHM's Route Business and continue expanding Meyer Enterprises' commercial laundry business in late 2012 because of the costs of building Meyer Enterprises' new facility and because expanding business had increased outstanding receivables.

15.     However, McAllister still encouraged JHM to continue purchasing the additional equipment needed for expansion with Firestone's financing.  This is why McAllister represented to JHM that Firestone would continue financing equipment packages submitted by JHM in 2013 on the same terms as the First Loan and Second Loan until the line of credit was established.

16.     In furtherance of its agreement, Firestone did provide the financing requested by JHM in February, 2013.  Sometime between February, 2013 and June, 2013, McAllister left Firestone's employment.  After McAllister left his employment, David Cohen, on behalf of

Firestone, confirmed his knowledge that Firestone represented to JHM that it would finance any equipment packages submitted in 2013 on the same terms and conditions as the First and Second Loans. However, Cohen agreed to finance only one additional package of equipment requested by JHM. This was the Fourth Loan. Firestone refused to provide any further financing. JHM had prepared and submitted to Firestone for financing another equipment package based on McAllister's representation that such packages would be financed in 2013.

17.     When Firestone refused to provide further financing, JHM had already purchased laundry equipment to be placed in its Route Business based on Firestone's commitment to provide financing. When Firestone refused to provide additional financing, JHM could not pay the amounts due for the equipment it had purchased from Maytag. As a result, Maytag refused to sell equipment to any entity affiliated with JHM including Dolphin and Meyer Enterprises and placed those companies on a credit hold. Bob Meyer told David Cohen that this would occur should Firestone refuse to provide the financing it represented it would provide.

18.     JHM's primary customer for its domestic equipment had committed to continue ordering equipment for its buildings. However, in order to maintain this business relationship, JHM required the ability to acquire equipment and equip each of the primary customer's buildings and apartment units when the customers needed the equipment. Because of Firestone's actions, JHM, Dolphin and Meyer Enterprises could no longer acquire equipment and could not sell equipment to the customer.

19.     Firestone induced JHM into purchasing equipment to expand its business by promising to provide a $500,000 line of credit beginning in 2013. When that line of credit was delayed, Firestone promised that it would finance any packages submitted in 2013 under the customary terms and conditions while finalizing the line of credit. JHM would not have purchased the equipment needed to expand its business if not for Firestone's commitment to provide financing. Firestone was informed that if it reneged on its commitment, JHM, Dolphin

and Meyer Enterprises would suffer substantial damages. However, Firestone still refused to honor its agreement and JHM, Dolphin and Meyer Enterprises have suffered substantial damages.

## Count I (Promissory Estoppel)

20.　　Counter-Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 14 above as paragraph 15 of this Count I as if fully set forth herein.

21.　　McAllister, as Firestone's Vice President of Business Development, told Bob Meyer that Firestone wanted to expand its financing of laundry businesses.

22.　　McAllister represented to JHM that Firestone would set up a $500,000 line of credit for use beginning in January, 2013. When establishment of the line of credit was delayed, McAllister represented to JHM that if JHM purchased the equipment necessary to expand its business, Firestone would finance equipment packages in 2013 on the same terms and conditions as the First and Second Loans.

23.　　In reliance on McAllister's promises, JHM purchased additional laundry and other equipment. Also in reliance on McAllister's promises, JHM committed to its primary customers that it would provide laundry and other necessary equipment in a timely manner as its customer developed new rental properties.

24.　　Firestone initially honored its agreement, providing financing when JHM requested it. Firestone then refused to provide further financing even though it was aware that JHM purchased its equipment in reliance on Firestone's promise to finance that equipment.

25.　　JHM's reliance on Firestone's promises was reasonable. McAllister was in charge of business development and stated he wanted to increase Firestone's investment in laundry related businesses. JHM knew that McAllister had witnessed a prosperous time for it, Meyer Enterprises and Dolphin and understood that McAllister wanted Firestone to take advantage of that opportunity. Firestone further induced JHM to continue expanding by

initially honoring its promises. Further, any financing by Firestone was collateralized by equipment providing security. All this reasonably led JHM to believe that Firestone would continue to honor its commitment.

26. When McAllister left Firestone, Firestone refused to honor the commitments he made on its behalf. Firestone's refusal to provide further financing after promising to do so, meant JHM could not pay for the equipment it purchased in reliance on Firestone's promise to finance equipment packages in 2013. As a result, JHM, Meyer Enterprises and Dolphin could not and cannot obtain Maytag equipment because they were placed on a credit hold. Nor can JHM provide equipment for its primary customer's new buildings and operate its existing business in the manner required because of the cash flow shortage caused by Firestone's refusal to provide financing.

27. Because of Firestone's failure to provide the promised financing, JHM has lost its primary customer for domestic equipment and can no longer obtain Maytag equipment. Firestone not only lost its current revenues, but lost the potential profits from its primary customer's expanding business, which are in the millions of dollars.

28. JHM reasonably relied on Firestone's commitments to its detriment. JHM has been damaged in an amount to be proven at trial.

For the foregoing reasons, Defendants request that judgment be entered against Plaintiff and in their favor, that they be awarded their costs and reasonable attorneys' fees, and that the Court provide all other appropriate relief.

Respectfully submitted,

By:     /s/ Brittany E. Kirk
         Todd A. Rowden (#6201929)
         Timothy L. Binetti (#6282534)
         Brittany E. Kirk (#6294386)
         THOMPSON COBURN LLP
         55 E. Monroe Street, 37th Floor
         Chicago, IL 60603
         312.346.7500

         ***Attorneys for JHM Equipment Leasing Company, J H Meyer Enterprises, Inc., Dolphin Laundry Services, Inc. and John Meyer***