**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIRESTONE FINANCIAL, LLC, | ) | |
| Successor by merger to FIRESTONE | ) | |
| FINANCIAL CORP., | ) | |
| | ) | Case No. 13-cv-07241 |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | Hon. Amy J. St. Eve |
| v. | ) | |
| | ) | |
| JOHN MEYER, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff/Counter-Defendant Firestone Financial, LLC ("Firestone") has moved for summary judgment on (1) Count IV of its complaint for breach of a guaranty agreement, and (2) Defendant/Counter-Plaintiff John Meyer's ("Meyer") counterclaim for promissory estoppel. (R. 203, Motion Summ. J.; R. 205, Mem. Supp. Summ. J., at 2–3.) For the following reasons, the Court grants Firestone's motion.

## BACKGROUND

This case arises from four loans, an alleged unfulfilled promise for additional loans, and the collapse of Meyer's businesses. Meyer owned and operated a number of businesses in Illinois dealing with laundry and laundry equipment. (R. 216, Meyer Statement of Facts, 16–18, ¶¶ 5–16.) In May 2011, Meyer incorporated JH Meyer Enterprises, Inc. ("Meyer Enterprises"), which operated commercial laundry facilities in which it "processed and then delivered laundry for its customers." (*Id.* at 17–18, ¶¶ 13–16.) In July 2011, Meyer incorporated Dolphin Laundry Services, Inc. ("Dolphin"), which sold commercial laundry equipment. (*Id.* at 17, ¶¶ 9–12.) In

April 2012, Meyer incorporated JHM Equipment Leasing Company ("JHM"), which "place[d] . . . laundry equipment in apartments and businesses on a revenue sharing or lease basis." (*Id.* at 16–17, ¶ 5–8.)

In 2010, representatives from the Maytag brand commercial laundry operations of Whirlpool Corporation discussed granting Meyer "exclusive rights to distribute commercial laundry equipment in Chicago, the surrounding ten counties and parts of northern Indiana [(the 'Distribution Area')]." (R. 219, Firestone's Response to Meyer's Statement of Additional Facts, ¶ 7.) Additionally, the Maytag representatives discussed granting Meyer "non-exclusive rights to distribute commercial laundry equipment in the Distribution Area to certain customers." (*Id.*) Meyer eventually received exclusive distribution rights in certain market segments. (*Id.* at ¶¶ 11, 13.) Meyer created Dolphin to operate the distribution business arising out of the newly acquired distribution rights. (*Id.* at ¶ 15.)

## I.      Firestone's Loans to Meyer

In approximately April 2012, Meyer contacted US Capital Corporation ("US Capital") to locate a company to finance JHM equipment purchases. (*Id.* at ¶ 26; R. 216 at 24, ¶ 26.) On behalf of JHM, US Capital submitted a loan request to Firestone. (R. 216 at 24, ¶ 26.) On April 12, 2012, Firestone says it declined a $35,000 loan request from JHM. (*Id.* at 24–25, ¶ 27.) Meyer claims he was never informed of such a denial. (*Id.*) Documents Firestone submitted to the Court indicate that while an analyst named Suzanne Harrington ("Harrington") said on April 12, 2012, that she was "not very comfortable with [extending the loan]," a person named Adam "told [her] to proceed." (R. 206 at Ex. D, Exs. 31–32.) Harrington further indicated that she was "not sure [Meyer] is someone [Firestone] should finance." (*Id.*) She also recounted some of his financial history, noting that he had $85,000 in collections and "31 liens, both state & federal tax

liens (mostly duplicates) that were a result of an audit from 1999/2000." (*Id.*) The Firestone

documents indicate that while Harrington "recommended rejection in April," Firestone

ultimately approved a loan on June 25, 2012. (*Id.*)

Before that loan approval, Meyer met with Dan McAllister ("McAllister"), the Vice

President of Business Development at Firestone. (R. 219 at ¶¶ 27–28.) At the meeting,

McAllister told Meyer he had reviewed JHM's equipment submission and asked him a number

of questions about his business. (*Id.* at ¶ 28.) According to Meyer, McAllister told him at the

meeting that he would make certain that Firestone funded JHM's loan request. (*Id.* at ¶ 29.)

Meyer admits, however, that Firestone employees reviewed relevant financial information prior

to providing the June 2012 loan. (R. 216 at 27, ¶¶ 34–37; R. 206, Ex. D, Tr. at 112.) He also

testified at his deposition that he "knew that [Firestone] had people who would look at the

transactions and evaluate the transactions" and that he knew Firestone would review his financial

and credit information before approving the loan. (R. 206, Ex. D, Tr. at 116.) Indeed, Meyer

remembers Firestone employees calling him before approving the loan to ask questions about his

business. (R. 206, Ex. D, Tr. at 117–18.)

The June 2012 loan was for a principal amount of $45,788—an amount equal to an

invoice from Dolphin for a purchase of laundry equipment. (R. 216 at 28, ¶¶ 39–40.) On behalf

of JHM, Meyer executed a promissory note on June 29, 2012 for the loan, under which he would

make 35 consecutive monthly payments of $1,461.45 followed by one final payment in an

amount to fully amortize the outstanding principal balance. (R. 206 at Ex. D, Ex. 5.) The

promissory note provided a "variable rate of interest equal to the Bank of America Prime Rate in

effect from time to time plus 6% (9.25%) per annum." (*Id.*) Additionally, on behalf of JHM,

Meyer and Firestone entered into a security agreement wherein JHM granted Firestone a security

interest in all of its assets and equipment used in connection with JHM's business. (R. 216 at 29, ¶ 42.) Meyer also signed a guaranty agreement in his individual capacity to personally guarantee the loan. (*Id.* at 29, ¶ 43.)

Throughout 2012, Meyer met with McAllister several times and provided him with additional financial information. (R. 219 at ¶ 31; R. 216 at Ex. D, Tr. 113–14.) Firestone representatives also called Meyer to ask for further information. (R. 216 at Ex. D, Tr. 116–18.) In November 2012, JHM submitted an equipment loan package and a Dolphin invoice with respect to a loan request for $44,165.25. (*Id.* at 29, ¶ 44.) On November 16, 2012, Meyer signed a promissory note on JHM's behalf for the $44,165.25 loan, agreeing to make 35 consecutive monthly payments of $1,440.75 plus a final payment in an amount sufficient to fully amortize the outstanding principal balance. (*Id.* at 30, ¶ 46; R. 206 at Ex. D, Ex. 10.) The promissory note provided "a variable rate of interest equal to the Bank of America Prime Rate in effect from time to time plus 7.5 percent (10.75%) per annum. (R. 206 at Ex. D, Ex. 10.) As with the first loan, Meyer also signed a personal guaranty as well as a security agreement. (R. 216 at 30, ¶¶ 47–48.)

Meyer claims that at an in-person meeting in November 2012, McAllister told him that Firestone would set up a line of credit for JHM's equipment purchases, "which he said he thought could be done by January 2013," and that in the meantime, Firestone "would fund, on the same loan document terms and provisions as used for the first two loans, JHM's equipment purchases." (R. 219 at ¶ 29.) Meyer says that McAllister "thought there would be no problem in obtaining the approval" for a $500,000 line of credit. (*Id.* at ¶ 40.) Firestone agrees that McAllister met with Meyer in 2012. (R. 216 at 36, ¶¶ 34–65.)

On November 16, 2012, McAllister sent an email to Meyer that said a Firestone employee named Jacqueline "will be following up with you to get the necessary documents for getting your line established for 2013. Obviously we can and will fund any equipment you need through the end of the year! My goal is to have your line established in January for use in 2013." (R. 206 at Ex. E, Ex. M-7.) In his deposition, Meyer said he told McAllister that it would "take time" and "approval process" to get the line of credit set up. (*Id.*, Ex. D, Tr. at 135.) Then, Meyer said McAllister told him that Firestone would have to approve the line of credit. (*Id.*) Meyer also indicated in his response to Firestone's Rule 56.1(a) statement that McAllister later said that the "line of credit would be delayed because he was too busy on developing other business for Firestone." (R. 216 at 44–45, ¶ 91.)

In addition to testifying that McAllister told him Firestone would approve loans, Meyer responded to a question of whether McAllister said there would not be a review process by answering, "I guess it implies that there wouldn't be a credit review." (R. 206, Ex. D at 136.) Meyer testified, however, that McAllister told him that he would "submit the same kind of paperwork that you're submitting in the past, and we'll approve those loans." (*Id.*)

After the November meeting, Meyer submitted to Firestone an equipment loan package and a Dolphin vendor invoice in the amount of $97,882.85. (R. 216 at 41, ¶ 79.) On February 19, 2013, Meyer signed a promissory note on behalf of JHM for a $97,882.85 loan. (R. 206 at Ed. D, Ex. 15.) The promissory note provided for "a variable rate of interest equal to the Bank of America Prime Rate in effect from time to time plus 6 percent (9.25%) per annum." (*Id.*) Additionally, it provided for fifty-nine consecutive monthly payments of $2,043.77 and a final payment in an amount sufficient to fully amortize the outstanding principal balance. (*Id.*) Along with the promissory note, Meyer signed a security agreement on behalf of JHM and a guaranty

agreement in his individual capacity. (R. 216 at 41, ¶¶ 82–83.) Meyer claims he did not believe Firestone employees reviewed financial information for this loan and that he did not receive any calls from Firestone about this loan. (*Id.* at 27–28, ¶¶ 36–38.) He also says that he believed McAllister had the authority to issue loans on Firestone's behalf. (*Id.* at 32, ¶ 56.) Firestone, in contrast, claims McAllister did not have authority to approve loans and that Firestone always used an underwriting process in which it would review a potential borrower's financial information. (*Id.* at 32, ¶ 56; 34, ¶¶ 60–61.)

Meyer submitted two more equipment packages in April 2013. (R. 219 at ¶ 50; R. 216 at 42, ¶ 85.) Meyer claims that he called McAllister when Firestone did not promptly fund the equipment packages and McAllister told him he no longer worked for Firestone. (R. 219 at ¶ 51.) Then, the CEO of Firestone, David Cohen ("Cohen"), contacted Meyer to tell him that he would follow up on his loan requests. (*Id.* at ¶ 52.) Cohen set up a meeting with Meyer for June 2013, and, according to Meyer, Cohen told Meyer at that meeting that Firestone would not fund either of the equipment packages. (*Id.* at ¶¶ 53–54.) Firestone admits that it declined the two loan requests. (*Id.*) Meyer claims he then told Cohen that he had already purchased the equipment after relying on Firestone's purported promise of funding. (*Id.* at ¶ 55.) Meyer also allegedly said that if he did not receive funding, Dolphin would "be out of payment terms with Maytag/Whirlpool and then could not buy parts or equipment and would be out of business." (*Id.*) Additionally, Meyer claims he told Cohen "that if JHM could not get parts[, it] would greatly limit the future plans of the commercial laundry business and could cause a loss of the commercial laundry business operations, and that all of these losses would total millions of dollars." (*Id.*) Meyer says that Cohen then told him that Firestone could fund one of the two equipment packages. (*Id.* at ¶ 56.) Meyer claims that he told Cohen that Dolphin would fall out

of compliance with the Maytag/Whirlpool payment terms unless Firestone funded both equipment packages. (*Id.*) Finally, Meyer claims that he told Cohen that JHM had purchased additional equipment not included in either of the two equipment packages. (*Id.* at ¶ 57.)

On June 17, 2013, the parties entered the fourth and final loan agreement. (R. 216 at 43, ¶ 86.) Meyer executed a promissory note for a $66,278.89 loan, agreeing to "a variable rate of interest equal to the Bank of America Prime Rate in effect from time to time plus 6.75% (10%) per annum" and 59 monthly payments of $1,408.23 followed by a final payment in an amount sufficient to fully amortize the outstanding principal. (R. 206 at Ex. E, Ex. M-13.) Meyer also signed a personal guaranty agreement and a security agreement on behalf of JHM. (R. 216 at 43, ¶¶ 88–89.) Firestone declined, however, to provide an additional loan worth about $30,000 and has not granted Meyer any loans since June 17, 2013. (*Id.* at 46–47, ¶¶ 95–96.)

Without the $30,000 loan and funding for additional equipment JHM had purchased, Meyer claims his business fell apart. He claims that in the past, Dolphin would invoice JHM for equipment that Dolphin had purchased on credit from Maytag and then Firestone would pay Dolphin. (*Id.* at 47, ¶ 99; 49, ¶ 105.) Meyer says by the time he met with Cohen in June 2013, he had already purchased on credit $50,000 of equipment that Firestone did not fund in addition to the equipment from the rejected loan. (*Id.* at 46–47, ¶ 96; R. 219 at ¶¶ 57–58.) According to Meyer, Dolphin eventually fell out of compliance with the payment terms with Maytag. (R. 219 at ¶ 64.) Meyer claims that without the ability to buy parts and equipment, Dolphin could not operate, and therefore Meyer Enterprises (the commercial laundry operation) paid Dolphin's bills, causing Meyer Enterprises to fail. (R. 219 at ¶ 65.) In all, Meyer claims lost profits of several million dollars. (R. 216 at 49, ¶ 106.)

Neither JHM nor Meyer paid off any of the four loans.  (*Id.* at 60, ¶¶ 148–49.)  According to Firestone, JHM made thirteen of the thirty-six payments due under the first loan, seven of the thirty-six payment on the second loan, four of sixty payments under the third loan, and no payments on the fourth loan.  (*Id.* at 61–63, ¶¶ 151–57.)[1]  In total, Firestone claims that Meyer is indebted to Firestone for $360,411.85 plus attorneys' fees and costs pursuant to the loan agreements.  (*Id.* at 61–66.)  Firestone's calculation includes $232,443.78 (the total principal balance) and prejudgment interest at 18% per annum through November 18, 2016 ($126,706.05).  (R. 206 at Ex. A at ¶ 61.)[2]

In October 2013, Firestone sued JHM, Meyer Enterprises, Dolphin, and Meyer for breach of contract, breach of guaranty, replevin, and detinue.  (R. 216 at 67, ¶ 166.)  On April 7, 2014, the court[3] entered a default judgment in favor of Firestone against JHM, Meyer Enterprises, and Dolphin for $286,794.02.  (*Id.* at 65, ¶ 162.)  On March 10, 2014, the court entered an order of replevin directing the United States Marshal to take possession of the collateral and deliver it to Firestone.  (*Id.* at 68, ¶ 169.)  A key client of JHM, Pangea, terminated its route service agreement with JHM on December 9, 2013.  (*Id.* at 68, ¶ 173.)  Since no later than December 2013, JHM and Pangea attempted to reach an agreement regarding the sale or transfer of the collateral and the route service business.  (*Id.* at 69, ¶ 175.)  Firestone alleges that "[d]espite having no obligation to do so, [it] advanced certain funds for third party servicing for Pangea in an effort to preserve the laundry route business for possible sale."  (R. 206 at ¶ 176.)[4]  Despite

---

[1] As described below, Meyer fails to adequately contest this fact.  *See supra* Analysis, § II.

[2] Meyer also fails to adequately contest this fact, as described below.  *See supra* Analysis, § II.

[3] Judge Shadur was the presiding judge at the time.

[4] Meyer asks that the Court disregard this statement because Firestone supposedly failed and refused to produce certain documents in response to a discovery request.  Meyer cites no authority supporting his contention.

Firestone and JHM's efforts, Pangea would not enter into a route service agreement with any party Firestone or JHM proposed.  (R. 216 at 70, ¶ 177.)  Firestone "received no offers for purchase of the Pangea Collateral that was not conditioned upon Pangea entering into a new route service agreement with the potential purchaser."  (*Id.* at 70, ¶ 179.)  On March 30, 2014, Meyer confirmed that Pangea refused to enter a new route service agreement, and, therefore, no third-party purchaser would buy the collateral held in Pangea properties.  (*Id.* at 71, ¶ 181.)  Also in late March 2014, Pangea, "after months without properly maintained and serviced laundry machines, required that Firestone remove the Pangea Collateral or sell it to Pangea.  (*Id.* at 71, ¶ 182.)  Firestone ultimately sold the Pangea Collateral to Pangea for $40,000.[5]

Additionally, on April 16, 2014, Firestone repossessed collateral held elsewhere (the "Bensenville Collateral"), which was sold in March 2014 for $27,810.  (*Id.* at 73, ¶¶ 188–89.)  Firestone says it credited Meyer, JHM, Dolphin, and Meyer Enterprises with the net proceeds of the two sales.  (*Id.* at 73, ¶¶ 187, 189.)

## II.     Procedural Background

As noted above, Firestone filed suit for breach of contract and breach of the guaranty agreement, among other claims, in October 2013.  (R. 1.)  On December 18, 2013, Meyer filed his answer, listed a number of affirmative defenses, and brought a counterclaim for promissory estoppel based on McAllister's alleged promise in November 2012 to extend Meyer credit for equipment purchases.  (R. 23; R. 113 at 3.)[6]  In April 2014, Judge Shadur granted Firestone a

---

Moreover, the time has passed to bring up discovery disputes.  The Court therefore will not disregard this statement of fact, which Meyer does not substantively dispute.  (R. 216, at 69–70, ¶ 176.)

[5] Meyer says that "it is [his] understanding that the Pangea Collateral could have been sold as a route if Firestone had maintained and repaired the equipment as it said it would do."  (R. 216 at 72, ¶ 184.)

[6] The Court notes that, to support his promissory estoppel claim, Meyer now relies only on McAllister's alleged promise to provide JHM loans while Firestone set up a $500,000 line of credit.  (*See* R. 217, Meyer's Opp., 8.)  He does not rely on an alleged promise to provide a $500,000 line of credit.  (*See id.*)

default judgment against JHM, Meyer Enterprises, and Dolphin. (R. 56.) The court dismissed the corporate defendants/counter-plaintiffs from the case. (*See* R. 187 (denying the corporate defendants' Rule 60 motion to reenter the case).) In February 2014, Firestone moved to dismiss Meyer's counterclaim based on the theory that it was implausible that Firestone, "a corporation with nearly 50 years in business, [would make] a handshake deal to loan half a million dollars to a start up business to be secured after the fact." (R. 113 at 4 (emphasis in original) (quoting R. 42 at 5).) Judge Shadur agreed with this argument and dismissed the promissory estoppel counterclaim in April 2014. (*Id.* at 5.) Firestone later moved for summary judgment on its breach of guaranty claim. (*Id.*) Judge Shadur granted Firestone's motion, noting that Meyer's affirmative defenses of promissory estoppel and prior-breach-of-contract were based on the same allegations as Meyer's counterclaim and therefore failed. (*Id.*)

On appeal to the Seventh Circuit, Meyer prevailed. The Seventh Circuit concluded that Meyer's allegations were enough to state a plausible promissory estoppel claim. The Court reasoned:

> Here, Mr. Meyer alleges that Firestone, through McAllister, told him that it would fund JHM's equipment purchases in 2013 under the same terms as its previous two loans. He asserts that JHM purchased equipment based on this representation and that Firestone knew that JHM would do so based on their earlier course of dealing. Finally, he alleges that Firestone later reneged on this commitment and that, as a result, JHM defaulted on its equipment purchases from Maytag, causing Maytag to blacklist Mr. Meyer's companies. These allegations are enough to state a plausible claim of promissory estoppel. *See Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 566 (7th Cir.2012) (concluding that a complaint, which "alleged a sufficiently clear promise, evidence of [the plaintiff's] own reliance [on that promise], and an explanation of the injury that resulted[,] ... was enough to present a facially plausible claim of promissory estoppel"). The district court, therefore, erred in dismissing Mr. Meyer's counterclaim.

(*Id.* at 10–11.)  Additionally, the Seventh Circuit reversed the district court's grant of summary judgment because it had relied on its erroneous dismissal of Meyer's counterclaim.  (*Id.* at 13.)[7]

On remand, the Executive Committee assigned this case to the undersigned.  (R. 114.)  In November 2016, Firestone once again moved for summary judgment on its guaranty claim and Meyer's promissory estoppel counterclaim (which, as explained below, forms the basis of Meyer's affirmative defense to the guaranty claim).

## LEGAL STANDARDS

### I.      Federal Rule of Civil Procedure 56

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000) ("The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff.").  In ruling on a motion for summary judgment, the court must consider the

---

[7] In opposing the motion before the Court, Meyer relies in part on the Seventh Circuit's decision in this case. Meyer's reliance is misplaced.  The Seventh Circuit reversed the district court's dismissal of Meyer's counterclaim based on its reasoning that the district court incorrectly applied the standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  (R. 113 at 8–11.)  It reversed the district court's grant of summary judgment for the same reason.  (*See id.* at 13 ("[T]he only possible basis for the district court's decision was Firestone's contention that the defenses at issue were barred by the court's earlier dismissal of Mr. Meyer's counterclaim.  Because, as we have explained earlier, the district court erred in dismissing Mr. Meyer's counterclaim, we must conclude that the court also erred in rejecting Mr. Meyer's [affirmative defenses] on summary judgment." (citation omitted)).)  The standards that govern the motion before the court and those that govern motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are distinct.  The 12(b)(6) standard requires courts to consider the plausibility of *allegations*, taken as true.  The summary judgment standard, as described below, requires courts to consider *facts*.  The Seventh Circuit's opinion in this case does not carry the day for Meyer.

record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence sufficient "to permit a jury to return a verdict for" the non-moving party. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010).

## II.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Local Rule 56.1(a) "requires the party moving for summary judgment to file and serve a 'statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Id.* at 218 (citation omitted). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific

references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Petty v. Chicago,* 754 F.3d 415, 420 (7th Cir. 2014) (citation omitted); *see also* L.R. 56.1(b)(3)(A). Local Rule 56.1(b)(3)(C) requires the non-moving party to file a separate statement of additional facts. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015).

Local Rule 56.1 statements and responses should identify the relevant admissible evidence supporting the material facts – not make factual or legal arguments. *See Zimmerman v. Doran,* 807 F.3d 178, 180 (7th Cir. 2015). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis*, 807 F.3d at 218 (quoting *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009)). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere,* 791 F.3d 764, 767 (7th Cir. 2015).

### III.    Meyer's Pro Se Status

Meyer is a pro se litigant, and generally, "[m]otions for summary judgment involving *pro se* litigants are construed liberally for the benefit of the unrepresented party, so as to ensure that otherwise understandable filings are not disregarded if the *pro se* litigants 'stumbles on a technicality.'" *Johnson v. Cook Cty. Jail*, No. 14-cv-0007, 2015 WL 2149468, at *2 (N.D. Ill. May 6, 2015) (quoting *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001)); *see also Bernstein v. Heritage Union Life Ins. Co.*, No. 1:13-cv-3643, 2017 WL 395702, at *3 n.3 (N.D. Ill. Jan. 30, 2017); *Townsend v. Alexian Bros. Med. Ctr.*, No. 13 C 1881, 2014 WL 3056543, at *1 n.1 (N.D. Ill. July 7, 2014). "That said, 'pro se litigants are not entitled to a

general dispensation from the rules of procedure.'" *Johnson*, 2015 WL 2149468, at *2 (quoting *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994)); *Bernstein*, 2017 WL 395702, at *3 n.3.

Meyer, however, is not a typical pro se litigant without familiarity with the complexities of litigation. Instead, Meyer earned a law degree at Harvard Law School in 1971 and practiced at various law firms. (R. 220-1; Disciplinary Decision, 9–10.)[8] In 2001, in an over-fifty-page single-spaced report and recommendation, the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission recommended disbarment for various types of misconduct. (R. 220-1.) Ultimately, after an appeals process, the Illinois Supreme Court disbarred Meyer. (*Id.* at 58.) A disbarred attorney—particularly one with substantial experience—does not enjoy the same leniency courts afford typical pro se litigants. *See, e.g.*, *Weston v. Ill. Dep't of Human Servs.*, 433 F. App'x 480, 482 n.1 (7th Cir. 2011) (per curiam); *Godlove v. Bamberger, Foreman, Oswald, & Hahn*, 903 F.2d 1145, 1148 (7th Cir. 1990) ("Ordinarily, we treat the efforts of *pro se* applicants gently, but a *pro se* lawyer is entitled to no special consideration."); *Polidi v. Bannon*, No. 1:16-CV-1535, 2016 WL 8135476, at *1 n.1 (E.D. Va. Dec. 28, 2016) (collecting cases from the Second, Fourth, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits, along with a number of district courts); *Moore v. City of New York.*, No. 08-CV-2449 RRM/LB, 2009 WL 2244735, at *1 n.1 (E.D.N.Y. July 28, 2009) (explaining that a disbarred attorney was "not entitled to the degree of liberality given to non-attorney pro se plaintiffs"); *United States v. Szeja*, No. 03 CR 36, 2004 WL 2581121, at *1 n.2 (N.D. Ill. Sept. 1, 2004) ("Ms. Rossini is a now-disbarred lawyer of substantial experience, so that the usual special

---

[8] The Court takes judicial notice of the Report and Recommendation of the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission and the order disbarring him, (R. 220-1 at 58), which Firestone attached to its Reply brief. *See* Fed. R. Evid. 201(b); *Denison v. Larkin*, 64 F. Supp. 3d 1127, 1129 n.3 (N.D. Ill. 2014); *Johnson v. McCann*, No. 11 C 5903, 2013 WL 623025, *1 at n.2 (N.D. Ill. Feb. 14, 2013); *United States v. Yarrington*, 838 F. Supp. 2d 832, 834 n.1 (C.D. Ill. 2012).

solitude with which pro se filings are scrutinized is not involved here." (citation omitted)); *see*

*also McInnis v. Duncan*, 697 F.3d 661, 665 (7th Cir. 2012) (per curiam) ("[A]lthough McInnis'

law degree does not make him a lawyer, his training should have given him greater insight than

the typical pro se litigant about the need to follow court directives.").

## ANALYSIS

### I.     Summary Judgment as to Liability

Firestone seeks summary judgment on its breach of guaranty claim and Meyer's

counterclaim for promissory estoppel.  Meyer relies solely on his affirmative defense of

promissory estoppel in opposing Firestone's motion for summary judgment—at least with

respect to liability—on its guaranty claim.[9]  Accordingly, the parties agree that whether summary

judgment is appropriate as to liability on Firestone's guaranty claim and Meyer's counterclaim

turns only on whether summary judgment is warranted on Meyer's promissory estoppel

counterclaim/affirmative defense.  In addition, Firestone contends that Massachusetts law

governs the counterclaim and the breach-of-guaranty claim, (R. 205, Mem. Supp. Summ. J., at

6–10), which Meyer does not dispute.

#### A.     The Breach of Guaranty Claim

Firestone argues that it is entitled to summary judgment on its claim that Meyer breached

the guaranty agreements he signed when JHM entered the four loans.  (R. 205 at 8.)  "A guaranty

is a contract like all other contracts."  *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*,

477 F. Supp. 2d 380–81 (D. Mass. 2007) (quoting *Fed. Fin. Co. v. Savage*, 730 N.E.2d 853, 856

(Mass. 2000)).  Firestone points out that JHM defaulted on all loans and that neither JHM nor

---

[9] As the Seventh Circuit noted, Meyer raised four affirmative defenses, including promissory estoppel.  (R. 113 at 3–4.)  The promissory estoppel defense was "based on the same factual allegations as [Meyer's] counterclaim."  (*Id.* at 4.)  In opposing summary judgment, Meyer's sole asserted affirmative defense is promissory estoppel.

Meyer has paid Firestone the outstanding value of the loans. Meyer does not dispute this beyond arguing that his affirmative defense of promissory estoppel precludes Firestone from recovering under the guaranty agreements. Thus, at least with respect to liability and putting aside Meyer's affirmative defense, Meyer does not dispute Firestone's claim that Meyer breached the guaranty agreements. The Court therefore turns to Meyer's promissory estoppel claim to determine if Firestone is entitled to summary judgment as to liability on its breach of guaranty claim.

### B. Meyer's Promissory Estoppel Claim and Defense

Under Massachusetts law, a party seeking to prove promissory estoppel must show "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 14 (1st Cir. 2014) (quoting *Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court*, 858 N.E.2d 699, 711 (Mass. 2006)); *see Egan v. Tenet Health Care*, 193 F. Supp. 3d 73, 86 (D. Mass. 2016); *Leonard v. PNC Bank, NA*, No. 11-11815-NMG, 2014 WL 1117990, at *17 (D. Mass. Mar. 18, 2014). Courts sometimes describe promissory estoppel as "a contract absent consideration." *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 204 (1st Cir. 2004). An essential element of promissory estoppel is an unambiguous promise that includes enough essential terms that a court could enforce a contract comprised of such terms. *See Gallant v. Boston Exec. Search Assocs., Inc.*, No. 13-12081-FDS, 2015 WL 3654339, at *12 (D. Mass. June 12, 2015); *see R.I. Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1178 (Mass. 1995); *Armstrong v. Rohm & Hass Co.*, 349 F. Supp. 2d 71, 82–83 (D. Mass. 2004). The proponent of a promissory estoppel claim faces a heavy burden. *See Sullivan*, 858 N.E.2d at 712; *Bowditch &*

*Dewey, LLP v. Diecast Realty Holdings*, No. 060151, 2007 WL 2705856, at *6 (Super. Ct. Mass. Aug. 30, 2007).

### 1.      Reasonable Reliance

Meyer bases his promissory estoppel claim on "McAllister's promise that Firestone would fund JHM's equipment purchases while Dan McAllister worked on putting in place the line of credit." (R. 217, Meyer Opp. Br., at 8.) Meyer does not base his claim on an alleged promise that Firestone would provide a $500,000 line of credit. (*Id.*) Firestone argues that Meyer cannot prove Firestone made a sufficiently unambiguous promise to support a promissory estoppel claim, (R. 205 at 11–13), and that it was not foreseeable to Firestone that JHM would purchase equipment it could not otherwise afford without a loan from Firestone based on McAllister's representations, (*id.* at 14; R. 220 at 19). Based on the undisputed facts, a reasonable jury could not find in Meyer's favor because Meyer's reliance was unreasonable as a matter of law. In other words, Meyer's reliance and resulting damages were not foreseeable to Firestone.

Even viewing the facts in the light most favorable to Meyer, too many red flags existed indicating that Meyer—a former attorney and an experienced businessman—should wait for a signed loan agreement before relying on McAllister's statements that Firestone would fund equipment purchases until a line of credit was in place. First, even if McAllister said in November 2012 that Firestone would fund equipment purchases on the same terms as the first two loans, a number of important terms remained open. As the Supreme Judicial Court of Massachusetts has noted, "in the case of a sizable commercial loan, it is unlikely that oral understandings which leave essential terms to future negotiation will support an enforceable loan agreement." *Lambert*, 865 N.E.2d at 1097 (quoting *Coolidge Bank & Trust Co. v. First Ipswich*

*Co.*, 401 N.E.2d 165, 165–66 (App. Ct. Mass. 1980)); *see also id.* ("commercial loan documents are generally detailed and 'drawn with manifest care' (quoting *Coolidge Bank*, 401 N.E.2d at 166)). "[T]he more vague a promise the less reasonable it is to rely on it." *Scanlan v. United States*, 825 F. Supp. 2d 941, 948 (N.D. Ill. 2011) (discussing and citing *Garwood Packaging, Inc. v. Allen & Co., Inc.*, 378 F.3d 698, 703 (7th Cir. 2004)); *see Armstrong*, 349 F. Supp. 2d at 75, 82–83 & n.16 (explaining that a promise was too vague to permit reasonable reliance). In a loan agreement, the key terms include the repayment period and frequency, the interest rate, and the amount of the loan. *See Walsh v. Morrissey*, 830 N.E.2d 217, 218–19 (App. Ct. Mass. 2005) (explaining that because an agreement did not specify payment timing or interest rates, it "represented merely the parties' intent to negotiate further in the hope of coming to terms in a formal purchase and sale agreement"); *see also, e.g.*, *Blackward Props., LLC v. Bank of Am.*, 476 F. App'x 639, 641 (6th Cir. 2012) (Sutton, J.) (explaining that in a financing agreement, "the amount of the loan, the interest rate, the repayment schedule or the collateral" are essential terms); *Szlek v. U.S. Bank N.A.*, No. 2:12-CV-00001-RWS, 2012 WL 3576941, at *3 (N.D. Ga. Aug. 28, 2012) (noting that a loan's duration and interest rate are essential terms); *Marine Midland Bank v. Herriott*, 412 N.E.2d 908, 909 (App. Ct. Mass. 1980) (concluding that a bank and a customer "never proceeded beyond the stage of imperfect negotiations" because "[s]ignificant provisions of the understanding about a new loan . . . remained open," including, among other things, the term of the loan and the manner and timing of interest payments).

Even taking as true Meyer's contention that McAllister said Firestone would fund all of his equipment purchases on the same terms as his first two loans—no further questions asked—until Firestone established a $500,000 line of credit, essential terms remained unsettled. The first and second loans covered different amounts and provided for different interest rates (first loan:

$45,788 and rate of the Bank of America Prime Rate plus 6% (9.25%); second loan: $44,165.25. and rate of the Bank of America Prime Rate plus 7.5% (10.75%)).  Furthermore, after McAllister said in November that Firestone would fund equipment purchases on the same terms as the first two loans until Firestone could set up a line of credit for $500,000, JHM and Firestone entered the third loan on terms different than the first two.  Specifically, Firestone loaned JHM $97,882.85 at an interest rate of the Bank of America Prime rate plus 6%, and provided for a 60-month repayment period rather than a 36-month repayment period like the first two loans. Accordingly, when Meyer caused JHM to purchase equipment from Dolphin and then requested funding for it from Firestone in April 2013, he should have first questioned whether he should rely on a promise of loans when the terms of those loans remained unclear.  *See Lambert*, 865 N.E.2d at 1097 (noting that in the context of commercial loans, "it is unlikely that oral understanding which leave essential terms to future negotiation will support an enforceable loan agreement (quoting *Coolidge*, 401 N.E.2d at 165–66)); *Armstrong*, 349 F. Supp. 2d at 83 n.16 (relying on a case in which an alleged oral stock option agreement that was silent as to the time of vesting and the exercise price was too vague to support reasonable reliance).[10]

Second, in light of the evidence of Meyer's prior dealings with Firestone and his experience as a businessman and former attorney, Meyer unreasonably believed as a matter of law that Firestone would fund any equipment purchase without further question, the signing of documents, or any further review of Meyer's finances.  Firestone first leant money to JHM in June 2012 after examining it and Meyer's finances and contacting Meyer multiple times. According to Meyer, McAllister told him before the parties signed the first loan agreement that

---

[10] Based on the above, it also appears that McAllister's statements that Firestone would fund additional purchases on the same terms as the first two loans were not sufficiently unambiguous to support a promissory estoppel claim.  The first two loans had different key terms, and the third loan further underscored that certain essential terms of any loan were in flux.

McAllister would "make certain" Firestone funded Meyer's loan request. (R. 219 at ¶ 29.) The loan provided a three-year repayment period. In November 2012, Firestone granted a second loan (with some key terms different than the first loan, as described above) after receiving financial information from Meyer. During that month, McAllister told Meyer that his goal was to establish a $500,000 line of credit by January 2013, but that Firestone would fund equipment purchases until Firestone established the credit line. Based on his deposition testimony, Meyer knew that it would take time and an "approval process" to get the line of credit set up. (R. 206 at Ex. D, Tr. 135.) Meyer also testified that McAllister told him that he would "submit the same kind of paperwork that you're submitting in the past." (*Id.*) Additionally, Meyer indicated that McAllister later told him that Firestone would have to delay establishing the line of credit. (R. 216 at 44–45, ¶ 91.) In February 2013, JHM and Firestone once again agreed to a loan in writing. As noted above, the terms of this third loan differed from the first two loans in certain key respects—most notably the amount of the loan ($97,882.85) and the repayment period (60 months). Then, in April 2013, Meyer submitted two more equipment packages to Firestone. Firestone funded one of them but not the other, and that unfunded equipment package constitutes part of Meyer's alleged detrimental reliance (Meyer also claims to have made other unfunded equipment purchases not included in the April 2013 equipment packages, (*see* R. 216 at 46, ¶ 97; R. 219 at ¶ 57)).

Based on this evidence and making all reasonable inferences in Meyer's favor, it was unreasonable for Meyer to rely on McAllister's statement that Firestone would fund JHM's equipment purchases. Based on the prior course of dealing, JHM and Firestone always entered detailed written contracts that specified all essential terms. Meyer should have expected to sign similar written contracts before Firestone would provide a loan, particularly because "in the case

of a sizable commercial loan, it is unlikely that oral understandings which leave essential terms to future negotiation will support an enforceable loan agreement." *Lambert*, 865 N.E.2d at 1097 (quoting *Coolidge Bank*, 401 N.E.2d at 165–66). Moreover, Meyer knew Firestone reviewed his financial documents—at least for the first two loans—and admits that McAllister told him that he would submit the same kind of documents as he had in the past. Thus, Meyer was on notice that Firestone's offer to provide future loans was contingent on Firestone reviewing his submissions. In addition, before the parties signed the documents for the first loan, McAllister told Meyer that he would make certain Firestone funded the loan. While this may have indicated McAllister's confidence in Meyer, it also showed that McAllister's word was not the final step to obtaining a loan. Instead, the parties signed various detailed documents and agreed to specific terms, such as an interest rate and a repayment schedule. Finally, Meyer acknowledges that Firestone reviewed his financial information and contacted him multiple times, further suggesting that McAllister's assurances were not by themselves sufficient.

Meyer's claim that Firestone would fund, without question or review, any equipment purchase for the indefinite period of time before Firestone established a $500,000 credit line is indicative of wishful thinking rather than the reasonable reliance of a former lawyer and experienced businessman. He relies on Firestone being unconcerned with changes in the global or national economy, changes in its business, or changes in Meyer's business. In addition, at the time, JHM had exceptionally tight liquidity, Meyer had questionable credit, and publicly available information called into question Meyer's professionalism. (*See* R. 216 at 56, ¶ 134 (noting JHM's "very tight cash flow"); R. 206, Ex. D, Ex. 32 (Firestone employee Suzanne Harrington noting her discomfort with loaning to Meyer based on his personal credit history).) The record also makes clear that Firestone knew about JHM's tight cash flow and Meyer's poor

personal credit. (*See* R. 216 at 56, ¶ 134; R. 206, Ex. E at 105 (noting that Meyer has poor personal credit and that JHM has a "lack of liquidity and tight debt service"); R. 206, Ex. E at 75 (noting credit scores for Meyer in the low 500s).) On top of these considerations, Meyer and Firestone had been engaged in business for a relatively short time, Meyer had not yet paid off any of his prior loans, and, as mentioned above, Firestone had previously reviewed Meyer and JHM's financial information before providing loans and told him to submit the same kind of documents that he had submitted for the first two loans when requesting future loans. Moreover, it is uncontested that Meyer knew that Firestone had not yet established his credit line and that Firestone had an approval process for such lines of credit. It would be incongruous if Firestone had a review process for the $500,000 line of credit but simultaneously would effectively grant an unlimited line of credit by agreeing to provide JHM with unlimited loans for an indeterminate amount of time.

In short, it was unreasonable as a matter of law for an experienced businessman and former attorney to conclude from McAllister's representations that Firestone would fund any and all of JHM's equipment purchases without any further review, particularly in light of the parties' prior dealings. The Seventh Circuit's decision in *Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank, N.A.*, 546 F.3d 839 (7th Cir. 2008), further supports this conclusion. There, the plaintiff company pitched a bank vice president for a business loan. 546 F.3d at 840. The vice president, after receiving the plaintiff's financial documents, orally assured the plaintiff that the bank would approve the loan, provided one of the principals of the plaintiff company paid off a defaulted student loan. *Id.* Later, the vice president told the plaintiff that the loan was a "go," although one of the plaintiff's principals knew at this point that the loan still had not been officially approved. *Id.* The vice president continued to verbally assure the plaintiff that the

bank would approve the loan until the bank subsequently declined the loan. *Id.* at 841. The plaintiff claimed significant reliance damages based on assurances of the loan's approval. *Id.* In discussing reasonable reliance, the Seventh Circuit explained:

> For the plaintiffs to treat the bank loan as a certainty because they were told by the bank officer whom they were dealing with that it would be approved was unreasonable, especially if, as the plaintiffs' damages claim presupposes, the need for the loan was urgent. Rational businessmen know that there is many a slip 'twixt cup and lips, that a loan is not approved until it is approved, that if a bank's employee tells you your loan application will be approved that is not the same as telling you it has been approved, and *that if one does not have a loan commitment in writing yet the need for the loan is urgent one had better be negotiating with other potential lenders at the same time*.

*Id.* (emphasis added); *see also ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 888 (7th Cir. 2011). The *Classic Cheesecake* court's reasoning is applicable here. A rational businessman should not have relied on McAllister's puffery, particularly given that key loan terms remained unresolved and the prior loans between Meyer and Firestone resulted in detailed signed agreements. *See also RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078 (4th Cir. 1982) ("In the instant case, RCM contends that it expended $951,000.00 in reliance upon the oral promise by HDI's officials to provide it with their lowest price and an unlimited line of credit for an indeterminate period of time, without regard to the state of RCM's financial condition. We find that incurring such large debts in reliance solely upon an oral promise of this nature clearly exceeds the bounds of commercial reasonableness and hence cannot support recovery under principles of promissory estoppel." (footnote omitted)); *Armstrong*, 349 F. Supp. 2d at 83 n.16; *Kimberton Chase Realty Corp. v. Main Line Bank*, No. CIV.A. 97-2767, 1997 WL 698487, at *6 (E.D. Pa. Nov. 3, 1997) (discussing justifiable reliance and concluding that experienced business people should not have relied upon oral assertions regarding loans and

should have pursued alternative financing options because they knew there was no written loan agreement); *G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1085, 1091 (D. Md. 1991) (noting that "sophisticated business entities don't enter into multimillion dollar transactions without a comprehensive writing"); *R.I. Hosp.*, 647 N.E.2d at 850 (explaining that experienced businessmen could not reasonably rely on a promise for a large loan where no promise in a contractual sense existed).

Because, as a matter of law, Meyer cannot prove that his reliance was reasonable or foreseeable to Firestone, his promissory estoppel counterclaim/affirmative defense fails.

### 2. Causation and Meyer's Damages

Beyond the issue of reasonable reliance, Meyer fails to put forth sufficient evidence of damages to evade summary judgment. Firestone argues that Meyer cannot establish lost profits because he lacks historical data of his companies' finances and has presented no financial records. (R. 205 at 17–20.) Meyer says that his response to Firestone Statement 137 shows that JHM had "positive cash flow and assets worth approximately $570,000 to $712,000 at the time Firestone refused to honor its promise." (R. 217 at 7–8.) With respect to Dolphin, Meyer says that in 2011, he transferred $195,000 to purchase inventory and other assets, which were lost when Firestone declined to fund JHM. (*Id.* at 8.) Meyer also claims his commercial laundry business had earnings of $184,640 in 2012 before interest, taxes, depreciation and debt service, and that the business had been profitable since 2007. (*Id.*)

Outside of conclusory statements in his affidavit, Meyer does not point to a single document to support his claims respecting damages—no bank statements, no accounting records, and no invoices from Maytag. While a plaintiff need not prove damages "with mathematical certainty, 'damages cannot be recovered when they are remote, speculative, hypothetical, and not

within the realm of reasonable certainty.'" *Pierce v. Clark*, 851 N.E.2d 450, 454 (App. Ct. Mass. 2006) (quoting *Kitner v. CTW Trans., Inc.*, 762 N.E.2d 867, 873 (App. Ct. Mass. 2002)); *RFF Family P'ship, LP v. Link Dev., LLC*, 932 F. Supp. 2d 213, 227 (D. Mass. 2013). Meyer's vague and conclusory affidavit cannot establish damages with reasonable certainty and he cites no authority indicating the conclusory allegations in his affidavit could be sufficient to establish damages.[11]

Rather than submit business records admissible under Federal Rule of Evidence 803(6), Meyer merely relies on statements lacking a factual foundation. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (explaining that to be considered on summary judgment, evidence must be admissible at trial, though the form of the evidence produced at summary judgment need not be admissible); *Young v. Monahan*, 420 F. App'x 578, 583 (7th Cir. 2011) ("Young cannot survive at summary judgment by substituting conclusory allegations in the complaint with conclusory allegations from affidavits."); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory allegations, unsupported by specific facts, will not suffice."); *Duah v. ABM Parking Servs., Inc.*, No. 15 C 1205, 2016 WL 4530309, at *5 (N.D. Ill. Aug. 30, 2016) ("A plaintiff's conclusory statements in an affidavit, unsupported by the evidence of record, do not suffice to avoid summary judgment."). With respect to Meyer Enterprises, the earnings calculation Meyer gives does not account for interest, taxes, depreciation, and debt service. Thus, the earnings calculation has little meaning. Indeed, if Meyer's earnings figure for Meyer Enterprises of $184,640 suggested large profits, then Meyer likely would have been able to mitigate any harm resulting from his reliance on any promise of funding from Firestone.

---

[11] Failure to cite any authority results in waiver. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017); *Torres v. City of Chicago*, No. 12 C 7844, 2016 WL 4158914, at *3 (N.D. Ill. Aug. 5, 2016).

Similarly, that Meyer transferred almost $200,000 to Dolphin in 2011 says nothing about what he lost when Firestone allegedly reneged on a promise in 2013.  Indeed, once again, if Dolphin had substantial assets, Meyer could have mitigated damages arising from Firestone's alleged conduct.  With respect to JHM, Meyer claims that because JHM had equipment loans, it "had sufficient cash flow from operations to pay for loans within a three year [repayment] period." (R. 216 at 56–57, ¶ 137.)  That JHM had loans, however, does not indicate anything about whether it could actually pay them off in the future.

Meyer also opines on the length of time laundry equipment will function in buildings of a certain size (according to him, 10 years or more) and the "selling price of routes for apartments in the Chicago area."  (*Id.*)  Meyer's opinions are expert opinions based on specialized knowledge under Federal Rule of Evidence 702 and are therefore inadmissible, as he has not suggested he will or can qualify or testify as an expert.  Even if his opinions were not based on specialized knowledge, Meyer's personal experience running JHM is far shorter than ten years. He therefore could not provide lay testimony about the length of time laundry equipment will function in buildings like those Pangea owns.  (*See id.*)  Additionally, Meyer's opinion as to the selling price of routes in the Chicago area generally (not the routes he dealt with specifically) goes far beyond Meyer's personal knowledge.  *See Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan, Int'l*, 533 F.3d 555, 560 (7th Cir. 2008) ("His attempt at valuation was not based on any knowledge obtained through his special relationship with the items in question; instead, he simply . . . estimated their value based on his extensive experience purchasing and selling the type of goods at issue.  This is the kind of testimony provided by an expert . . . .")  .  Accordingly, his opinion does not factor into the Court's summary judgment analysis.  *See Cairel*, 821 F.3d at 830.

In short, a jury would have no competent proof sufficient to determine Meyer's damages. *See Augat v. Aegis*, 631 N.E.2d 995, 997–98 & n.4 (Mass. 1994); *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 635 (7th Cir. 2007) ("TAS has failed, however, to produce any evidence that proves its lost profits to a reasonable certainty, and therefore TAS' claim must fail."); *Levin v. Grecian*, 974 F. Supp. 2d 1114, 1127 (N.D. Ill. 2013); *see also e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 603 (7th Cir. 2007). Because of this, Meyer's promissory estoppel claim fails.

The Court further notes that Meyer's utter failure to point to any financial documentation regarding any of his businesses precludes him from proving causation. Meyer's theory is that the failure to provide less than $100,000 in loans to one of his businesses caused all three of his businesses to collapse. Without any insight into the financial health of his businesses, however, a trier of fact could not determine the extent of harm, if any, that Firestone's alleged broken promise caused. *See Augat*, 631 N.E.2d at 997 ("The plaintiffs had to prove that Isotronics sustained monetary losses due to the defendants' wrongdoing. It was not sufficient simply to show Isotronics's projection of its sales and the historic return on total sales. Many factors bear on the financial performance of a company. The plaintiffs had to show the portion of Isotronics's losses, at least in general terms, that was attributable to the defendants' misconduct."). Because Meyer submitted no financial records, it is impossible to ascertain whether Firestone's refusal to provide additional funding—as opposed to some other cause— resulted in his claimed damages. This is particularly problematic in light of the fact that Meyer Enterprises has alleged in other cases that other actors caused its collapse. (*See* R. 220, Ex. 2, Compl., *JH Meyer Enters., Inc. v. Dickal L.L.C.*, No. 2015L000141 (Ill. Cir. Ct. Oct. 26, 2015), at ¶¶ 1, 45 (alleging that "as a direct result" of the defendant's wrongful conduct, Meyer

Enterprises ceased operations and "was effectively driven out of business"); *id.*, Ex. 3, Compl.,

*Laundry Works Laundromat Tr. v. Zaruba*, No. 2015 CH 00361 (Ill. Cir. Ct. Nov. 16, 2015), at

¶ 168 (alleging that Meyer Enterprises suffered financial losses based on another party's

wrongful trespass).)[12]  Because Meyer cannot, as a matter of law, establish causation, his

promissory estoppel claim cannot succeed.

## II.     Firestone's Damages

Meyer's only argument with respect to liability for breach of the guaranty was an

affirmative defense that the parties agree rose or fell with his counterclaim for promissory

estoppel.  Accordingly, the only remaining issue is Firestone's damages.  Meyer claims there is a

genuine dispute of material fact regarding Firestone's alleged failure to maintain the collateral

and Firestone's decision to sell the equipment without a route agreement.  (R. 217 at 10–11.)

A secured party may sell collateral after default, but the sale must be commercially

reasonable.  *See* Mass. Gen. Laws ch. 106 § 9-610.  When a creditor seeks a deficiency following

disposition of collateral, it enjoys a rebuttable presumption that the disposition was commercially

reasonable.  *Id.* at § 9-626(a)(1); *id.* (comment 3); *Am. Credit Corp. v. Birnbach*, 858 N.E.2d

316, at *2 (App. Ct. Mass. 2006) (unpublished table decision).  When a debtor challenges

whether the disposition was commercially reasonable, however, it becomes the secured

creditor's burden to establish commercial reasonableness.  § 9-626(a)(2); *id.* (comment 3); *Am.

Credit Corp.*, 858 N.E.2d at *2.  The First Circuit, in interpreting Massachusetts law, has

indicated that "a plaintiff must point to specific deficiencies in the conduct of the sale that render

it commercially unreasonable."  *Nadler v. BayBank Merrimack Valley, N.A.*, 733 F.2d 182, 184

---

[12] The Court may properly consider the existence of these complaints and their allegations, though the Court does not consider the truth or falsity of the allegations.  *See* Fed. R. Evid. 201(b); *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012); *Uppal v. Welch*, No. 15 C 8077, 2016 WL 2909652, at *3 n.2 (N.D. Ill. May 19, 2016); *Friello v. Bank of N.Y.*, No. 12 C 03270, 2012 WL 4892856, at *4 n.3 (N.D. Ill. Oct. 15, 2012).

(1st Cir. 1984); *Wells Fargo Bus. Credit v. Environamics Corp.*, 934 N.E.2d 283, 290 (App. Ct. Mass. 2010) (quoting the previously cited language in *Nadler*).

Meyer, a former attorney, does not cite any authority to support his argument in support of commercial unreasonableness. "Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017); *Torres v. City of Chicago*, No. 12 C 7844, 2016 WL 4158914, at *3 (N.D. Ill. Aug. 5, 2016) ("Critically, the motion contains a summary of the defendants' arguments with no citations to supporting authority. As discussed above, legally unsupported arguments are waived."). The Court notes, however, that Meyer's contention that Firestone should have sold the equipment with a route agreement falls flat. Meyer and Firestone both attempted to find a buyer for the Pangea routes, but Pangea refused the parties Firestone and Meyer proposed. (R. 216 at 69–71.) Meyer claims that Pangea refused because Firestone failed to maintain the equipment, but Meyer gives no basis for this contention and it is belied by the fact that Pangea eventually purchased the equipment itself. (*Id.* at 70–73.) The only potentially viable argument Meyer has regarding commercial reasonableness is that Firestone could have sold the equipment to Pangea for more money if Firestone had maintained the equipment better. (*Id.* at 71, ¶ 182.) This, however, is an argument that Meyer waived, as just discussed.

The remainder of the damages issue comes down to Firestone's damages calculation. Firestone claims $360,411.82 in damages (including prejudgment interest) less the proceeds from the sale of collateral, and attorneys' fees and costs in the amount of $134,529.49. (R. 205 at 23.)[13] Firestone bases this on affidavits, (*see* R. 206 at ¶¶ 145–65, 190), the loan promissory

---

[13] The guaranty agreement provides for attorneys' fees and expenses. (*See, e.g.*, R. 206 at Ex. A, Ex. 3.)

notes, and its lawyers' billing records, (*see* R. 206, Ex. G). Meyer disputes how many payments he has made on the loans, but he does so simply by stating that he does not know how many payments were made because Firestone failed to produce certain documents. (*See, e.g.*, *id.* at 62.) The time for discovery disputes has passed, and a lack of memory does not create a genuine issue of material fact. *See Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002); *United States v. Romero*, No. 15 C 5607, 2017 WL 61025, at *3 (N.D. Ill. Jan. 5, 2017). He does, however, claim that Firestone's calculation of prejudgment interest ($126,706.05) "do[es] not appear to be correct." (R. 216 at 64, ¶ 159.) Meyer gives no reason why he disagrees with Firestone's calculation and does not mention the damages calculation in his brief. Firestone, on the other hand, has provided a detailed calculation of its damages. (*See id.*, Ex. E at ¶ 61.) Meyer has had ample opportunity to contest Firestone's calculation. By opting not to with any specificity, and by not mentioning the issue in his brief, any argument that Firestone's calculation is incorrect is waived. *See M.G. Skinner*, 845 F.3d at 321. The Court therefore concludes that there is no genuine issue of material fact with respect to the damages calculation. Meyer also does not dispute Firestone's calculation of costs and fees. Accordingly, the Court awards Firestone's requested damages of $360,411.82 less the sale proceeds of $67,810.00 plus $134,529,49 in attorneys' fees and costs for total damages of $427,131.31.

## CONCLUSION

For the foregoing reasons, the Court grants Firestone's motion.

**DATED: February 23, 2017**                    **ENTERED**

AMY J. ST. EVE
United States District Court Judge